UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KEVIN E. SIERRA-LOPEZ,

           Plaintiff,

    v.                                      Case No. 14-C-1480

DR. FATOKI, et al.,

           Defendants.

---

## DECISION AND ORDER GRANTING
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

On November 24, 2014, Plaintiff Kevin Sierra-Lopez, a minor at the time, filed this action under 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights. Because he was a minor, the court appointed a guardian ad litem to represent Sierra-Lopez's interests in the case pursuant to Fed. R. Civ. P. 17(c). At an April 27, 2015 telephone conference, the guardian ad litem advised the court that Sierra-Lopez was no longer a minor, but that counsel would continue to represent him on a pro bono basis. Sierra-Lopez filed an amended complaint on June 30, 2015, alleging that the defendants refused to provide him with a finger splint, which resulted in permanent injury; denied him shampoo and a bed, which are necessary to ensure civilized confinement; and denied him his prescription medication. The court screened the complaint on July 31, 2015 and found that it at least stated claims upon which relief may be granted, and allowed the case to proceed.

Sierra-Lopez filed a second amended complaint on October 8, 2015, asserting claims regarding the conditions of his confinement and deliberate indifference to his serious medical needs.

Defendants Dr. Fatoki and Erika Weichard (the medical defendants) filed a motion for summary judgment on December 16, 2016. (ECF No. 46.) Defendants Lieutenant M. Hallisee, Lieutenant J. Timreck, Lieutenant J. Trinkner, Christopher Patterson, Corporal R. Weed, Corporal Misty Anderson, Corporal Ralph Leyendecker, and K. Smith (the county defendants) have also filed a motion for summary judgment. (ECF No. 53.) For the following reasons, the defendants' motions will be granted and the case dismissed.

## PRELIMINARY MATTERS

Before turning to the parties' substantive arguments, the court will address two preliminary matters. First, the defendants assert that their proposed findings of fact must be deemed admitted and that Sierra-Lopez's proposed findings must be stricken because Sierra-Lopez did not comply with the district's local rules regarding summary judgment procedures. Pursuant to the local rules, along with the motion for summary judgment, the moving party is required to file either a statement of material facts to which the parties have stipulated or a statement of proposed material facts as to which the moving party contends there is no material issue and that entitle it to judgment as a matter of law. Civil L.R. 56(b)(1). The statement of proposed facts is comprised of numbered paragraphs containing short factual statements and specific references to affidavits, declarations, parts of the record, and other supporting materials. Civil L.R. 56(b)(1)(C).

The party opposing the motion must file a response to the moving party's statement of undisputed facts which is intended to make clear which, if any, of those facts are in dispute, and to set forth any additional facts that bear on the motion. The opposing party's response must reproduce each numbered paragraph of the moving party's statement of facts followed by a response to each

paragraph. Civil L.R. 56(b)(2)(B). If the fact is disputed, the party must include a specific reference to an affidavit, declaration, or other part of the record that supports the claim that a genuine dispute exists as to the fact stated by the moving party. *Id.* If the opposing party believes there are additional facts that prevent the entry of summary judgment, he should include a statement, consisting of short numbered paragraphs that set forth each additional fact and include references to the affidavits, declarations, or other parts of the record that support the assertion. Civil L.R. 56(b)(2)(B)(ii).

In this case, Sierra-Lopez filed a brief in opposition to the defendants' motions for summary judgment but did not file a response to either of the defendants' proposed findings of fact. Instead, Sierra-Lopez included a section in his brief labeled "Statement of the Case" that did not contain any citations to the record or a declaration, did not directly respond to the defendants' proposed findings of fact, and lumped several factual assertions together in a single paragraph. Plaintiff's brief also contained a section entitled "Statement of Disputed Facts and Citations," but again, this section does not directly address the defendants' proposed facts and instead makes broad factual assertions that do not contain pinpoint citations. The Seventh Circuit has made clear that a "district court is not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'" *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000)). In short, Sierra-Lopez failed to comply with Civil L.R. 56.

The Seventh Circuit has "routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions." *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626 (7th Cir. 2010) (citing *Patterson v. Indiana Newspapers Inc.*, 589 F.3d 357, 360

(7th Cir. 2009)).  Therefore, the court will deem the defendants' statement of facts admitted for purposes of summary judgment, except where a proper response has been provided, and the court will only consider Sierra-Lopez's additional facts insofar as they comply with Civil L.R. 56.  *See Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809–10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed.").

In addition, Sierra-Lopez listed Does 11 to 50 as defendants in this action.  In the court's August 31, 2015 screening order, the court advised Sierra-Lopez that he had until September 15, 2015 in which to identify the proper defendants and to file an amended complaint naming them.  To date, he has not filed an amended complaint that provides the names of Doe defendants.  Because he has not identified the Doe defendants in a timely manner, his claims against them will be dismissed with prejudice.  With these considerations in mind, the court now turns to the instant motions.

## BACKGROUND

Sierra-Lopez's claims arise from the defendants' conduct in 2014, but the parties' history began in September 2013, when he was first booked into the Brown County Jail.  On September 29, 2013, Sierra-Lopez went into the Jail's custody after being charged with robbery with use of force in Brown County Case No. 13-CF-1393.  (County Defs.' Proposed Findings of Fact (CDPFOF) at ¶ 7, ECF No. 55.)  In January 2014, Sierra-Lopez was further charged with aggravated battery and second degree recklessly endangering safety in Brown County Case No. 14-CF-80.  (*Id.* at ¶ 8.) Shortly thereafter, the issue of Sierra-Lopez's competency was raised in Case No. 14-CF-80, and

4

on February 25, 2014, the Brown County Circuit Court ordered an evaluation of Sierra-Lopez's competency. (*Id.* at ¶ 9.)

Dr. Hurlbut, the psychologist assigned to conduct the competency evaluation, met with Sierra-Lopez on March 6, 2014. (*Id.* at ¶ 10.) Once the meeting concluded and Sierra-Lopez returned to his cell, he flooded the Brown County Jail's dayroom. This required officers to remove Sierra-Lopez and other inmates from their cells to clean the mess resulting from the flood. (*Id.* at ¶¶ 11–12.) As officers led Sierra-Lopez back to his clean cell, he began resisting and spit in an officer's face. (*Id.* at ¶ 12.) He was subsequently charged with assault by a prisoner for this incident. (*Id.* at ¶ 13.) At a competency hearing held at the Brown County Courthouse on March 28, 2014, Sierra-Lopez was found incompetent and committed for treatment. (*Id.* at ¶ 15.) He was then admitted to Mendota Mental Health Institute (MMHI) for treatment on April 7, 2014. (*Id.* at ¶ 16.)

Upon arrival at MMHI, Sierra-Lopez was placed in the Management and Treatment Unit, which is used to treat and manage the most aggressive psychiatric patients, though he was transferred to a less restrictive maximum security unit on April 22, 2014. (*Id.* at ¶¶ 23, 28.) MMHI staff ultimately diagnosed Sierra-Lopez with conduct disorder, cannabis use disorder, and malingering. (*Id.* at ¶ 34.) MMHI staff described Sierra-Lopez's malingering diagnosis as follows:

> Some of the major criteria for a diagnosis of malingering include: 1) false or exaggerated symptoms, 2) intentionally produced symptoms, and 3) symptoms that are motivated by external incentives. Since the time of admission, and throughout this admission, Mr. Sierra-Lopez has consistently exhibited behaviors that meet the first two criteria, and his current legal situation certainly would serve as an "external incentive" behind his motivation to behave in such a manner.

(*Id.* at ¶ 36.) Staff noted "Sierra-Lopez appears to be well aware of his rights, both in legal situations and as a patient at MMHI, given his ability to file numerous grievances against staff at MMHI." (*Id.* at ¶ 37.)

Sometime in May 2014, Sierra-Lopez fractured the middle finger on his left hand. A May 27, 2014 x-ray report revealed a "questionable tiny ventral avulsion fracture at the base" of the finger. (Medical Defs.' Proposed Findings of Fact (MDPFOF) at ¶ 21, ECF No. 48; ECF No. 51-1 at 3.) On June 27, 2014, an MMHI physician saw Sierra-Lopez regarding a nasal fracture and a follow-up for the injury to his left middle finger. (ECF No. 51-1 at 2.) Although his left hand showed he had swelling around the PIP joint of his finger, the joint did not have any instability. An x-ray completed earlier that day did not show any fracture. (MDPFOF at ¶ 24.) Nevertheless, the physician referred Sierra-Lopez to the hand therapist to be fitted for a custom-made finger splint. (ECF No. 51-1 at 2.)

On July 10, 2014, Sierra-Lopez was adjudicated competent for trial and was to be discharged from MMHI. (CDPFOF ¶ at 17.) His assigned MMHI social worker contacted Brown County Jail's health services unit (HSU) prior to his transfer to the Jail and recommended that the Jail place Sierra-Lopez on suicide precautions. (*Id.* at ¶ 45.) He was transferred from MMHI to the Brown County Jail on July 12, 2014. (MDPFOF at ¶ 3.) When Sierra-Lopez was booked into the Jail, he indicated on a booking observation report that he was taking Risperdal and had a "broken finger on his left hand." (*Id.* at ¶ 10.) After Nurse Weichart and Dr. Fatoki reviewed the report, Dr. Fatoki approved Sierra-Lopez's continued use of Risperdal. (*Id.* at ¶¶ 12, 26.) He renewed Sierra-Lopez's prescription for Risperdal or its generic form, Risperidone, several times during Sierra-Lopez's time at the Jail. (*Id.* at ¶ 27.) Dr. Fatoki was not responsible for administering medication to inmates.

(*Id.* at ¶ 28.) Instead, nursing staff and correctional staff disbursed medication. Nurse Weichart administered Sierra-Lopez's medication on some occasions in August and September 2014, and she never denied him his prescribed medication. (*Id.* at ¶¶ 13–14.) Sierra-Lopez was generally compliant with taking his medications, though he occasionally refused to take it. (*Id.* ¶¶ 16, 30.) At other times, his medication could not be administered because he was engaged in an active conflict with correctional staff when medication was distributed. (*Id.* at ¶ 17.)

On July 15, 2014, Sierra-Lopez claimed he was suicidal but refused to be removed from his cell. (CDPFOF at ¶ 47.) As a result, a psychiatric nurse reported to his cell for observation. (*Id.*) When the nurse spoke with Sierra-Lopez, he complained that he was not given his finger splint and stated he would not answer any of her questions until he got it. (*Id.* at ¶ 48.) On July 16, 2014, Sierra-Lopez filed a medical request for his splint. (MDPFOF at ¶ 20.) Nurse Sonnenberg assessed his finger and noted that, while the finger was slightly swollen, there was no fluid at the joint, and his finger displayed an active range of motion. (*Id.* at ¶ 22.) During the examination, Sierra-Lopez also complained of dandruff. (CDPFOF at ¶ 51.) Nurse Sonnenberg did not observe an open area, drainage, or localized redness on his scalp. (*Id.*) After her evaluation, Nurse Sonnenberg reviewed the MMHI records which indicated Sierra-Lopez's finger fracture had healed. (MDPFOF at ¶ 23.) She provided a summary of her examination and review of the medical records to Dr. Fatoki. (*Id.* at ¶ 25.) Based on Nurse Sonnenberg's report and his professional judgment, Dr. Fatoki concluded that a finger splint was no longer necessary and denied Sierra-Lopez's request for his splint. (*Id.*)

On July 31, 2014, Sierra-Lopez told officers he was suicidal but refused to be removed from his cell. (CDPFOF at ¶ 53.) Officers continued to monitor him and made numerous attempts to move him to an observation cell. Sierra-Lopez eventually told officers he was cutting himself. An

officer approached his cell and observed Sierra-Lopez smearing blood on the cell door window. (*Id.*) The Correctional Emergency Response Team (CERT) extracted Sierra-Lopez from his cell, and secured him in a restraint chair. (*Id.* at ¶ 54.) Officers confirmed Sierra-Lopez had cut himself but were unable to locate the object he used to do so. (*Id.*) Later that day, officers placed Sierra-Lopez in an observation cell, and he began kicking the cell door. (*Id.* at ¶ 55.) He ignored orders to stop kicking the door and ultimately set off multiple alarms. (*Id.*)

On August 2, 2014, Sierra-Lopez flooded his cell and kicked the cell door so hard that he set off alarms. (*Id.* at ¶ 56.) The next day, he smashed a cell window with his meal tray. (*Id.* at ¶ 57.) CERT extracted Sierra-Lopez from his cell and placed him in a restraint chair. (*Id.*) Officers asked if he had any injuries, and Sierra-Lopez responded that his finger hurt but had no other injuries. (*Id.* at ¶ 59.) A nurse came to speak with Sierra-Lopez and evaluate his finger. (*Id.*) During the examination, he repeatedly threatened the nurse and officers. (*Id.* at ¶ 58.)

Brown County Jail staff determined that based on his behavior over the past few weeks, Sierra-Lopez presented a substantial risk of physical harm to himself, other persons, or property and threatened the security and order of the Jail. (*Id.* at ¶ 61.) As a result, on August 3, 2014, staff placed Sierra-Lopez on Administrative Confinement. (*Id.* at ¶ 60.) The initial conditions of Sierra-Lopez's confinement included housing in a cell with a secure trap; a blanket, towel, uniform, sandals, and a mattress; and squares of toilet paper. (*Id.* at ¶ 61.) He was allowed his hygiene products but the Jail did not allow water to flow to his toilet because of his repeated attempts to flood his cell. The water in his sink remained on and he could request that officers flush his toilet as needed. He was prohibited from possessing books, whites, or paperwork because he used paper, clothing, and other materials to cover his cell window and clog the cell drains. He was allowed to request paper

and a pencil between 9:00 a.m. and 10:00 a.m. daily. The Jail served his meals in a paper boat because he damaged property with his meal tray. (*Id.*) Sierra-Lopez's behavior was reviewed weekly by a housing corporal to determine whether the conditions of confinement established on August 3, 2014 remained necessary. (*Id.* at ¶ 62.) If he did not have any "major" conduct incidents or documented incident of self-harm or threats of self-harm, his conditions of confinement would become less restrictive. (*Id.*)

On August 12, 2014, Sierra-Lopez submitted an inmate request for medical care and complained of small red bumps on his ribs. (*Id.* at ¶ 64.) He also asked when he would receive something for his dry skin and dandruff. A nurse advised Sierra-Lopez that he would be seen at the next available appointment. (*Id.*)

On August 13, 2014, Sierra-Lopez told officers he took a piece of metal from the smoke detector's protective grate in the secured shower and would turn it over in exchange for a telephone call. (*Id.* at ¶ 65.) Sierra-Lopez refused to leave his cell voluntarily which resulted in CERT removing him from his cell to confiscate the metal contraband. (*Id.* at ¶ 66.) During the extraction, Sierra-Lopez spit on the officers. (*Id.*) The following day, Sierra-Lopez claimed to possess glass shards, covered his cell window, and refused to follow orders to clear his cell window and exit the cell. (*Id.* at ¶ 67.) Again, CERT, with the assistance of the K-9 unit, removed Sierra-Lopez from his cell. Sierra-Lopez refused to cooperate after the extraction and tried to provoke the K-9 unit. (*Id.*) Officers determined Sierra-Lopez had damaged the sprinkler head in his cell and tried to tear a table from the cell wall. (*Id.* at ¶ 68.) He was subsequently moved to punitive segregation. (*Id.*) As a result of Sierra-Lopez's disruptive behavior, conditions were added to his Administrative Confinement order on August 15, 2014. (*Id.* at ¶ 69.) He was no longer allowed a blanket, towel,

and uniform because he continued to use them to cover his cell window. Instead, he was given a smock and a smock blanket. (*Id.*) After he received his new conditions, Sierra-Lopez became upset and threatened staff with a piece of metal, covered his cell window, kicked the cell door, and threw urine at an officer. (*Id.* at ¶ 70.)

On August 16, 2014, CERT extracted Sierra-Lopez and four other inmates from their cells when they coordinated efforts to disrupt the Jail's operations by claiming to be suicidal at the same time. (*Id.* at ¶ 71.) On August 22, 2014, Sierra-Lopez argued with an officer about his Administrative Confinement order, complaining that he should not be restricted from possessing a blanket, uniform, or pencils. (*Id.* at ¶ 73.) During the confrontation, Sierra-Lopez threw a toothpaste container full of urine at the officer. (*Id.* at ¶ 74.) His Administrative Confinement order was immediately amended to restrict Sierra-Lopez's ability to keep hygiene products in his cell. (*Id.* at ¶ 75.) He was given hygiene materials during his shower and was required to return them to officers when he was finished. (*Id.* at ¶ 76.) Later that day, Sierra-Lopez attempted to kick out his cell window, resulting in a CERT extraction. (*Id.* at ¶ 77.) When officers arrived for the removal, they noticed Sierra-Lopez had removed all of the caulking surrounding the window. (*Id.*)

On August 24, 2014, Sierra-Lopez tried throwing bodily fluids at an officer. (*Id.* at ¶ 78.) His Administrative Confinement order was updated with additional conditions that prevented him from using the shower. (*Id.* at ¶ 79.) He was provided a bar of soap, toothbrush, and paper towels to use for one hour each day and was required to return the items to staff. (*Id.*) Jail staff were required to put toothpaste on Sierra-Lopez's toothbrush before giving it to him so he did not have access to the toothpaste tube. (*Id.* at ¶ 80.) On August 25, 2014, Sierra-Lopez threw a metal object at a window, causing it to crack. (*Id.* at ¶ 81.) He told a counselor that he broke the window

because he did not get a shower. (*Id.*) On August 27, 2014, the Administrative Confinement order was changed and restricted him from using the telephone for attorney calls. (*Id.*)

After this outburst, Sierra-Lopez did not engage in any conduct violations for one week. (*Id.* at ¶ 82.) As a result, he earned back the privilege to have one set of whites, a uniform, and a towel. (*Id.*) But on September 8, 2014, Sierra-Lopez spit on and repeatedly kicked a deputy during his transport to the Jail following a court appearance. (*Id.* at ¶ 83.) On September 11, 2014 and September 15, 2014, Sierra-Lopez told staff he was suicidal but refused to move to a safety cell. (*Id.* at ¶ 84.) CERT was required to remove him from his cell on both occasions. (*Id.*) Also on September 15, 2014, Sierra-Lopez blocked his cell window with toilet paper, paperwork, and his smock blanket. (*Id.* at ¶ 85.) Accordingly, he lost his privilege to possess whites, a uniform, and a towel, and the Jail gave him a smock and another smock blanket. (*Id.*)

On September 18, 2014, Sierra-Lopez earned back the privilege to have unlimited access to a pencil and his paperwork. (*Id.* at ¶ 86.) By September 25, 2014, he was allowed a uniform, whites, and a towel. (*Id.* at ¶ 87.) On October 2, 2014, Sierra-Lopez was allowed unlimited access to books and a religious book and access to the secure shower twice a week. (*Id.* at ¶ 88.)

HSU staff saw Sierra-Lopez on October 13, 2014 regarding sores on his scalp. (*Id.* at ¶ 89.) The nurse saw no dandruff and scant bloody areas on the top of his head. She instructed Sierra-Lopez to stop picking or scratching his scalp. (*Id.*) Dr. Fatoki prescribed T-Gel shampoo for Sierra-Lopez's head and C-Cream for his complaints about dry skin. (*Id.* at ¶ 90.)

By October 16, 2014, Sierra-Lopez had earned back most of his privileges. (*Id.* at ¶ 91.) On October 23, 2014, he was removed from Administrative Confinement and "granted the privileges normally allowed for his classification and housing status." (*Id.* at ¶ 92.) But by December 17,

11

2014, Sierra-Lopez returned to Administrative Confinement. (*Id.* at ¶ 93.) The Jail took his mattress away from December 17, 2014 to December 20, 2014 because he had used it to block his cell door. (*Id.* at ¶ 95.) On December 18, 2014, Sierra-Lopez covered his cell with toilet paper, banged on his sink, and told officers he was going to harm himself with a piece of metal. (*Id.* at ¶ 96.) On December 23, 2014, he told officers he was suicidal and covered his cell window. (*Id.* at ¶ 97.) Multiple officers spoke with Sierra-Lopez for over an hour, and he told them he hurt his finger. Sierra-Lopez voluntarily left his cell, and the officers immediately called the nurse on duty about his finger. (*Id.*) The nurse told the officers to contact Dr. Fatoki. (*Id.* at ¶ 98.) Dr. Fatoki instructed the officers to send Sierra-Lopez to the hospital for evaluation. He was transported to the hospital by squad car. (*Id.*)

On another occasion in December 2014, Sierra-Lopez told officers he had glass and metal in his cell and threw bodily fluids at the officers. (*Id.* at ¶ 99.) In January 2015, he flooded the day room multiple times. (*Id.* at ¶ 100.) He also refused to surrender a piece of glass to officers, which resulted in a total lock-down of the Jail. He covered his cell window with a torn-up t-shirt, toilet paper, and other materials; threatened to kill officers; threatened to break his own wrist and blame it on officers; and spit on officers. (*Id.*)

In February 2015, the cold water in his cell had stopped working. When he became frustrated with the officers' attempts to resolve the problem, he responded "Fuck that, I'm suicidal" and had to be transferred to an observation cell. (*Id.* at ¶ 101.) Later in February 2015, Sierra-Lopez obtained another piece of glass and offered to surrender it if he was moved to a different cell. (*Id.* at ¶ 102.) He also blocked his cell window and the bottom of his cell door, threw toilet paper at the officers, flooded his cell, and slid feces-smeared paper under his cell door into the dayroom.

(*Id.*)  Sierra-Lopez was ultimately removed from his second administrative confinement on July 16, 2015 and transferred to a different institution on July 28, 2015.  (*Id.* ¶ 103.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party has the burden of showing there are no facts to support the nonmoving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  All reasonable inferences are construed in favor of the nonmoving party.  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted).  "Material" means that the factual dispute must be outcome-determinative under the law.  *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).  A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor.  Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.*  Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Sierra-Lopez asserts the defendants violated his constitutional rights because they were deliberately indifferent to his medical needs and they created inhumane conditions of confinement. The parties do not dispute that Sierra-Lopez's claims arise under the Due Process Clause of the Fourteenth Amendment because at all times relevant to this case, he was a pretrial detainee. *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (citing *Rice ex rel. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012)). A pretrial detainee is "entitled to at least the same protection against deliberate indifference to his basic needs as is available to convicted prisoners under the Eighth Amendment." *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). Therefore, the court applies the same legal standards to claims brought under either the Eighth or Fourteenth Amendments. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010).

## I. Deliberate Indifference

Sierra-Lopez asserts that the defendants were deliberately indifferent to his serious medical needs in three ways: (1) the defendants denied his request for a splint for his finger upon his admission to the jail; (2) the defendants denied him his mental health medication; and (3) the defendants were indifferent to his skin condition. The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. Amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states

14

a violation of the Eighth Amendment. An inmate's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that claim." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012).

The parties do not dispute that Sierra-Lopez suffered from an objectively serious medical condition. Thus, the court need only consider whether he has set forth sufficient evidence for a jury to reasonably conclude that the defendants were deliberately indifferent to his condition. Deliberate indifference requires more than negligence or even gross negligence; it requires that the officials knew of, yet disregarded, an excessive risk to an inmate's health or safety. *Farmer*, 511 U.S. at 835, 837; *see also Estelle*, 429 U.S. at 104. It is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). "A state officer is deliberately indifferent when he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016) (internal citations omitted).

As a threshold matter, the court notes that Sierra-Lopez appears to have abandoned his claim that the defendants were deliberately indifferent to his skin condition. There is nothing in his brief in opposition to the defendants' motions for summary judgment regarding this issue. Therefore, summary judgment will be granted as to this claim. The court will now address Sierra-Lopez's remaining deliberate indifference claims against the defendants.

**A. Finger Splint**

Sierra-Lopez asserts that the defendants were deliberately indifferent to his serious medical needs when they denied his request for a finger splint. On July 16, 2014, two days after he was transferred to the Brown County Jail, Sierra-Lopez filed a medical request to obtain a splint for his

left middle finger. (MDPFOF at ¶ 20.) Sierra-Lopez had injured his finger sometime in May of 2014. A May 17, 2014 x-ray report revealed a "questionable tiny ventral avulsion fracture at the base" of the middle finger on Sierra-Lopez's left hand. (ECF No. 51-1 at 3.) On the same day that Sierra-Lopez submitted his request, Nurse Sonnenberg assessed his finger and noted that while the finger was slightly swollen, there was no fluid at the joint and the finger displayed an active range of motion. (*Id.* at ¶ 22.) Nurse Sonnenberg noted that she reviewed medical records from MMHI, which contained a June 27, 2014 x-ray report that Sierra-Lopez's finger fracture had healed. (*Id.* at ¶ 23; ECF No. 51-1 at 2.) She provided a summary of her examination and review of the medical records to Dr. Fatoki. (MDPFOF at ¶ 25.) Based on her report and his professional medical judgment, Dr. Fatoki concluded that a finger splint was no longer necessary and denied Sierra-Lopez's request for his splint. (*Id.*) When Sierra-Lopez complained of pain, Dr. Fatoki approved his requests for ibuprofen or Tylenol. (*Id.* at ¶ 32.)

Sierra-Lopez argues that Dr. Fatoki was deliberately indifferent to his medical needs because he did not review the medical records himself and instead relied on Nurse Sonnenberg's evaluation and summary of the records. He asserts that even though the June 27, 2014 x-ray "did not show any fracture," the physician at MMHI referred Sierra-Lopez to a hand therapist to be fit for a custom-made splint. (ECF No. 51-1.) Thus, Sierra-Lopez argues that Dr. Fatoki should have followed MMHI's discharge instructions which he contends required that he wear his splint at all times. However, physicians are not required to defer to the opinions or recommendations of another care provider. "[T]he prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against

accepted professional standards." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Similarly, the Eighth Amendment does not require that a physician comply with the treatment preferences of a prisoner.

To the extent Sierra-Lopez asserts that Dr. Fatoki's decision to deny the use of the finger splint was medically erroneous, a mistake in medical judgment, without more, cannot be characterized as disregard for an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837; *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (noting that "a medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment").

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Zaya v. Sood*, 836 F.3d 800, 805–06 (7th Cir. 2016). Sierra-Lopez has not shown how Dr. Fatoki acted with the requisite culpable state of mind necessary to establish a claim of deliberate indifference. In drawing his conclusions, Dr. Fatoki relied on Nurse Sonnenberg's report of Sierra-Lopez's condition, which was based on her physical assessment of his finger as well as her review of the medical records. In essence, Nurse Sonnenberg's assessment and the MMHI records revealed that Sierra-Lopez's finger fracture had healed. Based on his medical judgment, Dr. Fatoki concluded that Sierra-Lopez no longer needed a finger splint. In short, Sierra-Lopez has not established that Dr. Fatoki's decision to deny his request for a finger splint rose to the level of deliberate indifference.

After Dr. Fatoki denied the request for the finger splint, Sierra-Lopez filed a grievance against him. Nurse Weichart reviewed and subsequently denied Sierra-Lopez's grievance because Dr. Fatoki determined a splint was not warranted. Sierra-Lopez argues that if Nurse Weichart had independently reviewed the medical records, "she would have come to realize that Fatoki's denial of the splint was in clear error." (Pl.'s Br. in Oppn. at 7.) The Seventh Circuit has held that nurses are entitled to rely on the judgment of an institution's physician. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 686 (7th Cir. 2012); *Holloway*, 700 F.3d at 1075–76. Sierra-Lopez does not identify any reason why Nurse Weichart should have known that Dr. Fatoki's denial of his request for a finger splint was improper. Accordingly, Nurse Weichart's actions in denying Sierra-Lopez's grievance did not violate the Constitution.

## B. Medication

Sierra-Lopez also asserts that the medical defendants were deliberately indifferent to his serious medical needs when they denied him mental health medication. He asserts that "he has been denied medication when he is in confinement or they attempt to give him medication when he is sleeping." (Pl.'s Br. in Oppn. at 6 (citing Sierra Lopez Decl., ECF No. 63 & Sierra-Lopez Dep. 31–51, ECF No. 64).) His argument fails, however, because he has provided no evidence other than this broad assertion that he has been denied mental health medication. Although in his deposition he contends that he did not receive medication on "several occasions," he could not recall any specific incidents where he was denied medication or who denied it. Even if he was denied medication while in confinement, there is no evidence that any of the defendants were the staff members who denied him access to mental health medication. Sierra-Lopez has the burden of proof for his claims, and at the summary judgment stage, he must demonstrate that he has some evidence

that would allow a jury to find in his favor.  *See Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) ("We often call summary judgment, the 'put up or shut up' moment in litigation.").  Because Sierra-Lopez has failed to provide any support for his claim that the defendants denied him access to his prescribed medication, summary judgment must be granted in the defendants' favor.

Sierra-Lopez also avers in his declaration that Nurse Weichart and Dr. Fatoki ignored his repeated requests for a specific medication he was prescribed at MMHI that suppressed the voices in his head.  But again, medical professionals are not required to defer to the opinions of an inmate's former care provider.  *See Holloway*, 700 F.3d at 1073.  When Sierra-Lopez was transferred from MMHI to the Brown County Jail on July 12, 2014, he indicated in the booking observation report that Risperdal was the only medication he was currently taking.  After reviewing the booking observation report, Dr. Fatoki made an independent medical determination to approve Sierra-Lopez's use of Risperdal or its generic form, Risperidone, and renewed his prescription for the medication a number of times.  During his time at the Jail, Sierra-Lopez filed numerous requests for medical care complaining about hearing voices in his head.  In response to his requests, medical staff instructed him to continue taking his medications as prescribed.

Although Sierra-Lopez may have preferred that the medical defendants prescribe another medication, the Eighth Amendment does not require that a medical professional comply with the treatment preferences of a prisoner.  *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).  And Sierra-Lopez has not demonstrated that the medical defendants' decision to only prescribe Risperdal to treat his mental health was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the

19

decision" on his medical judgment. *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)). The record suggests that the decision to prescribe Risperdal was a reasonable one. Sierra-Lopez was prescribed Risperdal both at MMHI and the Brown County Jail, and he was generally compliant with taking the medication. In sum, Sierra-Lopez has failed to establish that Nurse Weichart and Dr. Fatoki were deliberately indifferent to his need for mental health medication. Accordingly, the court will grant the medical defendants' motion for summary judgment.

## C. County Defendants' Treatment of Sierra-Lopez's Medical Needs

Sierra-Lopez argues the county defendants were deliberately indifferent to his medical needs by failing to address "his mental health symptoms in apparent direct violation of his intervention plan." (Pl.'s Br. in Oppn. at 8.) However, the intervention plan was created by MMHI staff members to treat his behavior and mental outbursts at that institution. The plan was not intended to be a recommendation for expected treatment at the Brown County Jail or an order that the Jail was expected to follow. In short, the county defendants were not bound by MMHI's "intervention plan" or its recommended course of treatment once Sierra-Lopez was transferred to the Jail.

To the extent Sierra-Lopez asserts that the county defendants were deliberately indifferent in denying his requests to receive medical care, either for his splint or for his mental health, his claim fails. The county defendants deferred to the opinions of the medical defendants regarding his treatment. "Except in the unusual case where it would be evident to a lay person that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002); *see also Berry v. Peterman*, 604 F.3d 435, 440–41 (7th Cir. 2010). Sierra-Lopez has not shown that he was

receiving inadequate treatment from medical staff or that the county defendants knew he was receiving such inadequate treatment. Therefore, he has failed to establish that the county defendants were deliberately indifferent to his medical needs.

## II. Conditions of Confinement

The Eighth Amendment generally prohibits "punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' . . . or are grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 171 (1976)). Punishment involves the "unnecessary and wanton" infliction of pain when it is "totally without penological justification." *Gregg*, 428 U.S. at 183. Conditions of confinement will be found to violate the Eighth Amendment when they fall below the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Determining whether a plaintiff's constitutional rights have been violated requires a "fact-intensive inquiry under constitutional standards." *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006) (citation omitted). Stated differently, "the conditions of confinement are not to be analyzed in a vacuum but in the context of the inmate's own behavior and other circumstances." *Bowers v. Pollard*, 602 F. Supp. 2d 977, 988 (E.D. Wis. 2009).

This case is similar to *Bowers v. Pollard*, 602 F. Supp. 2d 977 (E.D. Wis. 2009), *aff'd*, 345 F. Appx. 191 (7th Cir. 2009). There, the plaintiff was a manipulative inmate who regularly acted out and harmed himself by inserting items into his penis. As a result, the institution where he was

confined placed him on a Behavior Act Plan, which contained certain restrictions on Bowers' property and provided that he be placed in restraints any time he threatened to harm himself. *Id.* at 981. He was left naked in the restraints for as long as twelve hours and was not released when he needed to use the restroom. *Id.* at 991. Although the court found that placing Bowers in the restraints was a reasonable response to his behavior, the defendants did not offer any explanation for why he was kept naked or why he was left to urinate or defecate on himself. *Id.* at 992. For these reasons, the court was unable to conclude that these conditions did not fall within the Eighth Amendment's definition of cruel and unusual punishment. *Id.* Nevertheless, the court found that Bowers did not present any evidence that the defendants acted with the intent to cause wanton harm or humiliation. Instead, the undisputed evidence showed that the defendants acted with the intent to protect Bowers' well-being and to preserve and maintain institutional order. *Id.* at 992–93.

Likewise, in this case, Sierra-Lopez's constant disruptive and uncontrollable behavior resulted in the Brown County Jail implementing an Administrative Confinement order which restricted some of his privileges. In other words, his conduct was the motivating factor in the imposition of the very conditions about which he now complains. There is no real dispute that Sierra-Lopez engaged in a series of disruptive behavior that presented a substantial risk of physical harm to himself, other persons, or property and threatened the security and order of the Jail. As a result, Sierra-Lopez was placed on administrative confinement on August 3, 2014. The general conditions of Sierra-Lopez's confinement are also undisputed. At times he was allowed only a smock, smock blanket, and paper towels to dry off with and denied possession of books, whites, or paperwork because he repeatedly used paper, clothing, and other materials to cover his cell window and clog the cell drain. But he was not denied complete access to paper; he could request paper and

a pencil between 9:00 a.m. and 10:00 a.m. daily. Though he was denied possession of his hygiene products because he continuously used empty containers to throw his urine on staff members, jail staff gave him his hygiene products for one hour each day and collected them when Sierra-Lopez finished using them. He was restricted from making calls to attorneys because he threw a metal object at his cell window, which caused it to crack. One of the harsher conditions Sierra-Lopez suffered—the lack of a mattress for three days—only emerged after he had used the mattress to block his cell door.

These conditions did not function so much as punishment but as necessary to effectuate institutional order, to ensure Sierra-Lopez's safety, and to prevent him from harming others. The terms of the Administrative Confinement order were reevaluated on a weekly basis and were amended in response to Sierra-Lopez's behavior. When Sierra-Lopez did not engage in any conduct violations, he earned back certain privileges, and when he acted out, he lost them. "[W]hen a prison is facing a recalcitrant and uncontrollable inmate, it has a freer hand to take steps to impose discipline and ensure the inmate's own safety without running afoul of the Eighth Amendment." *Id.* at 989.

Sierra-Lopez has not presented any evidence from which a factfinder could conclude that the terms of the Administrative Confinement order were anything other than a justified, particularized response to his disruptive and self-harming behavior. Instead, his sole argument in opposition to the county defendants' motion is that the defendants have failed to present any evidence about themselves individually to "exonerate their behavior." (Pl.'s Br. in Oppn. at 8.) However, on a motion for summary judgment, it is the plaintiff's burden to present evidence on each element of his claim; it is not defendant's burden to disprove it. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013). Sierra-Lopez has not demonstrated that the conditions of his confinement were

individually or collectively serious to deny him any of life's necessities or that the defendants acted with the intent to cause wanton harm. Therefore, summary judgment will be granted in favor of the county defendants.

## CONCLUSION

For the foregoing reasons, the medical defendants' motion for summary judgment (ECF No. 46) and the county defendants' motion for summary judgment (ECF No. 53) are **GRANTED**. The Clerk is directed to enter judgment dismissing the case with prejudice.

**SO ORDERED** this ⎯26th⎯ day of July, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

24